UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATHERINE RUBERY, Derivatively on Behalf of ALCOA INC., | ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| KLAUS KLEINFELD, JUDITH M. GUERON, KATHRYN S. FULLER, ERNESTO ZEDILLO, JAMES W. OWENS, RATAN N. TATA, MICHAEL G. MORRIS, E. STANLEY O'NEAL, PATRICIA F. RUSSO, ALAIN J. P. BELDA, FRANKLIN A. THOMAS, HENRY B. SCHACHT, JOSEPH T. GORMAN, CARLOS GHOSN, VICTOR DAHDALEH, and WILLIAM J. RICE, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants, | ) ) |
| | ) |
| -and- | ) ) |
| | ) |
| ALCOA INC., a Pennsylvania corporation, | ) ) |
| | ) |
| Nominal Defendant. | ) ) |

Case No.

Electronically Filed

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, CONTRIBUTION AND INDEMNIFICATION, AND AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY**

**<u>DEMAND FOR JURY TRIAL</u>**

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by plaintiff, a shareholder of Alcoa Inc. ("Alcoa" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, and order contribution and indemnification.  These wrongs resulted in hundreds of millions of dollars in illicit payments that have caused damage to Alcoa's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of the Foreign Corrupt Practices Act ("FCPA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO").  In addition, the Company is under investigation by the U.S. Department of Justice ("DOJ") and U.S. Securities and Exchange Commission ("SEC") for possible civil and criminal penalties.  Plaintiff brings her claims for the Individual Defendants' (as defined herein) utter failure to act in the face of a known legal duty to act causing a breach of their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

2.     Alcoa is a producer of aluminum.  The Company is active in all major aspects of the aluminum industry including: technology, mining, refining, smelting, fabricating, and recycling.  Aluminum Bahrain, B.S.C. ("Alba") is owned by a holding company for the Government of Bahrain and is one of the world's largest aluminum smelters.  The principle ingredient needed to smelt aluminum is alumina.  Alcoa was Alba's principal supplier of its alumina needs, and had been for decades.

3.     On February 27, 2008, Alba sued Alcoa for violations of RICO, conspiracy to violate RICO, civil conspiracy, and fraud (the "Alba Action").  The complaint alleges that certain Alcoa entities and their agents engaged in a conspiracy over a period of over fifteen years to

defraud the Government of Bahrain to overpay Alcoa for alumina by approximately $2 billion. The complaint further alleges that Alcoa and its employees or agents: (i) illegally bribed officials of the Government of Bahrain and/or officers of Alba in order to force Alba to purchase alumina at excessively high prices; (ii) illegally bribed officials of the Government of Bahrain and/or officers of Alba and issued threats in order to pressure Alba to enter into an agreement by which Alcoa would purchase an equity interest in Alba; and (iii) assigned portions of existing supply contracts between Alcoa and Alba for the sole purpose of facilitating alleged bribes and unlawful commissions.  Alba's complaint seeks compensatory, consequential, exemplary, and punitive damages, and attorneys' fees and costs.  Alba also seeks treble damages with respect to its RICO claims.

4.      Soon after Alba filed its complaint, the DOJ began its own criminal investigation into whether Alcoa violated the FCPA by engaging in the acts alleged in the Alba Action.  The FCPA makes it unlawful for covered companies such as Alcoa to make improper payments to foreign officials to obtain or retain business.  To prevent such bribes and kickbacks from occurring, the FCPA requires that covered companies establish and maintain a system of accounting controls to ferret out and ultimately prevent such illicit payments.  Non-compliance with the FCPA may result in fines, sanctions, and other adverse actions, including exposing the Company to civil liability.  Because Alcoa operates in some countries that involve a higher than normal risk of violations of the anti-corruption laws, including the FCPA, the Alcoa Board of Directors (the "Board") had a fiduciary duty to install and maintain internal controls and accounting system for compliance with the FCPA.  Alcoa and the Individual Defendants failed to do this.

5.      In a letter dated March 21, 2008, plaintiff demanded that the Company conduct an investigation into Alba's allegations to determine which employees, officers, or directors were responsible for the illegal bribery scheme.  Plaintiff further demanded that Alcoa then initiate legal proceedings to hold accountable the responsible fiduciaries for the damage done to the Company.  In that same letter, plaintiff sought to exercise her statutory right to review certain of the Company's books and records for the proper purpose of investigating whether the Company was being mismanaged or engaging in illegal activities.

6.      The Company denied plaintiff's demand to inspect certain books and records, but stated that the Board would consider her litigation demand at its next meeting.  However, rather than timely respond to the litigation demand, the Board alerted plaintiff that it would only consider plaintiff's litigation demand after the DOJ and the Company finished their own investigations.  Over the next three years, plaintiff and the Company exchanged a number of letters.  Plaintiff repeatedly explained to the Board that it was running the risk of letting valuable claims expire and that it must enter into tolling agreements with the potentially culpable fiduciaries.

7.      Despite plaintiff's pleas that the Board act in accordance with its fiduciary duties and consider her litigation demand to prosecute the wrongdoers and preserve the Company's claims, the Board consistently stated that it would not consider plaintiff's demand while the other investigations were occurring.  Thus, even though plaintiff specifically alerted the Board it was obligated by its fiduciary duties to protect the Company's interests, the Board utterly and completely failed to act in accordance with these duties.  As a result of the Individual Defendants' breaches of fiduciary duty, the Company now faces significant liability for violations of the FCPA and RICO, the latter of which subject it to treble damages.  On June 11,

2012, Judge Ambrose of the United States District Court for the Western District of Pennsylvania rejected three separate motions to dismiss filed by Alcoa, Victor Dahdaleh ("Dahdaleh"), and William J. Rice ("Rice") in the Alba Action.  Thus, Alcoa's liability and costs related to the Alba Action are damaging the Company.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on this court or a court of the United States that it would not otherwise have.

9.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Alcoa maintains a principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of

fiduciary duties owed to Alcoa, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

11.     Plaintiff Catherine Rubery was a shareholder of Alcoa at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Alcoa shareholder.  Plaintiff is a citizen of South Carolina.

12.     Nominal Defendant Alcoa is a leader in the production and management of primary aluminum, fabricated aluminum, and alumina combined, through its participation in all major aspects of the industry: technology, mining, refining, smelting, fabricating, and recycling. Aluminum and alumina represent more than 80% of Alcoa's revenues.  Nonaluminum products include precision castings and aerospace and industrial fasteners. Alcoa's products are used worldwide in aircraft, automobiles, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial applications.  Alcoa is a Pennsylvania corporation with a principal place of business located at 201 Isabella Street, Pittsburgh, Pennsylvania.

13.     Defendant Klaus Kleinfeld ("Kleinfeld") is Alcoa's Chairman of the Board and has been since April 2010; Chief Executive Officer ("CEO") and has been since May 2008; and a director and has been since 2003.  Kleinfeld was also Alcoa's President from October 2007 to April 2010 and Chief Operating Officer from October 2007 to May 2008.  Kleinfeld was also a member of Alcoa's Audit Committee from at least March 2004 to at least February 2007. Kleinfeld served two years as CEO at Siemens AG ("Siemens"), a German electronics and industrial conglomerate.  Kleinfeld announced his resignation from Siemens in April 2007 amid

a scandal involving company executives trying to bribe potential customers.  Kleinfeld breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, Kleinfeld knew, was reckless in not knowing, or grossly negligent, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business. Kleinfeld also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.  As a member of the Audit Committee, Kleinfeld was charged with reviewing and monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance.  Further, in violation of his Audit Committee duties, Kleinfeld knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.  In his capacity as a director of Alcoa, Kleinfeld was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.  Kleinfeld knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA.  In sum, Kleinfeld utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.  Kleinfeld is a citizen of New York.

14.     Defendant Judith M. Gueron ("Gueron") is Alcoa's Lead Director and has been since April 2010 and a director and has been since 1988.  Gueron was also a member of Alcoa's Audit Committee from at least May 1991 to at least March 2010.  Gueron breached her fiduciary

duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals. Due to Alcoa's extensive overseas operations, Gueron knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business. Gueron also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company. As a member of the Audit Committee, Gueron was charged with reviewing and monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance. Further, in violation of her Audit Committee duties, Gueron knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements. In her capacity as a director of Alcoa, Gueron was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA. Gueron knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA. In sum, Gueron utterly failed to act in the face of a known duty to act causing a breach of her duty of loyalty by failing to discharge her fiduciary obligations in good faith. Gueron is a citizen of New York.

15. Defendant Kathryn S. Fuller ("Fuller") is an Alcoa director and has been since 2002. Fuller was also a member of Alcoa's Audit Committee in 2002. Fuller breached her fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals. Due to Alcoa's extensive overseas operations, Fuller knew or was reckless in

not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.  Fuller also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.  As a member of the Audit Committee, Fuller was charged with reviewing and monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance. Further, in violation of her Audit Committee duties, Fuller knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.  In her capacity as a director of Alcoa, Fuller was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.  Fuller knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA. In sum, Fuller utterly failed to act in the face of a known duty to act causing a breach of her duty of loyalty by failing to discharge her fiduciary obligations in good faith.  Fuller is a citizen of Washington, D.C.

16.    Defendant Ernesto Zedillo ("Zedillo") is an Alcoa director and has been since 2002. Zedillo is also a member of Alcoa's Audit Committee and has been since 2002.  Zedillo breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, Zedillo knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.  Zedillo also

knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.   As a member of the Audit Committee, Zedillo was charged with reviewing and monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance.   Further, in violation of his Audit Committee duties, Zedillo knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.   In his capacity as a director of Alcoa, Zedillo was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.   Zedillo knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA.   In sum, Zedillo utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.   Zedillo is a citizen of Connecticut.

17.     Defendant James W. Owens ("Owens") is an Alcoa director and has been since 2005.   Owens is also Chairman of Alcoa's Audit Committee and has been April 2010, and a member of that committee and has been since March 2008.   Owens breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals. Due to Alcoa's extensive overseas operations, Owens knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.   Owens also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and

kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.   As a member of the Audit Committee, Owens was charged with reviewing and monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance.   Further, in violation of his Audit Committee duties, Owens knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.   In his capacity as a director of Alcoa, Owens was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.   Owens knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA. In sum, Owens utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.   Owens is a citizen of Illinois.

18.     Defendant Ratan N. Tata ("Tata") is an Alcoa director and has been since 2007. Tata breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.   Due to Alcoa's extensive overseas operations, Tata knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.   Tata also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.   In his capacity as a director of

Alcoa, Tata was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.  Tata knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA.  In sum, Tata utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.  Tata is a citizen of India.

19.     Defendant Michael G. Morris ("Morris") is an Alcoa director and has been since 2008.  Morris is also a member of Alcoa's Audit Committee and has been since at least March 2011.  Morris breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, Morris knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.  Morris also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.  In his capacity as a director of Alcoa, Morris was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.  Morris knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA.  In sum, Morris utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.  Morris is a citizen of Michigan.

20.     Defendant E. Stanley O'Neal ("O'Neal") is an Alcoa director and has been since 2008.  O'Neal is also a member of Alcoa's Audit Committee and has been since January 2008.  O'Neal breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, O'Neal knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.  O'Neal also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.  As a member of the Audit Committee, O'Neal was charged with reviewing and monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance.  Further, in violation of his Audit Committee duties, O'Neal knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.  In his capacity as a director of Alcoa, O'Neal was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.  O'Neal knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA.  In sum, O'Neal utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.  O'Neal is a citizen of New York.

21.     Defendant Patricia F. Russo ("Russo") is an Alcoa director and has been since 2008.  Russo breached her fiduciary duties owed to Alcoa by causing or allowing the illegal

bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, Russo knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business. Russo also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.  In her capacity as a director of Alcoa, Russo was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.  Russo knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA.  In sum, Russo utterly failed to act in the face of a known duty to act causing a breach of her duty of loyalty by failing to discharge her fiduciary obligations in good faith.  Russo is a citizen of Florida.

22.     Defendant Alain J. P. Belda ("Belda") was Alcoa's Chairman of the Board from January 2001 to April 2010 and a director from 1998 to April 2010.  Belda was also Alcoa's CEO from May 1999 to May 2008; President from 1997 to January 2001; Chief Operating Officer from 1997 to May 1999; Vice Chairman from 1995 to 1997; Executive Vice President from 1994 to 1995; and President of Alcoa's Brazilian subsidiary, Alcoa Aluminio S.A., from 1979 to 1994.  Belda breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, Belda knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or

retain business.  Belda also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.  In his capacity as a director of Alcoa, Belda was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA. Belda knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA. In sum, Belda utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.  Belda is a citizen of Brazil.

23.     Defendant Franklin A. Thomas ("Thomas") was an Alcoa director from 1977 to April 2010.  Thomas was also Alcoa's Lead Director from at least February 2003 to April 2010. Thomas was Chairman of the Audit Committee from at least May 1991 to at least March 1997, and a member of that committee from at least May 1991 to February 2002.  Thomas was also a member of Alcoa's Special Committee formed to investigate the Alba allegations.   Thomas breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, Thomas knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.  Thomas also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the

transactions and dispositions of the assets of the Company.   As a member of the Audit Committee, Thomas was charged with reviewing and monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance.   Further, in violation of his Audit Committee duties, Thomas knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.   In his capacity as a director of Alcoa, Thomas was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.   Thomas knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA.   In sum, Thomas utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.   Thomas is a citizen of New York.

24.   Defendant Henry B. Schacht ("Schacht") was an Alcoa director from 1994 to April 2010.   Schacht was also Chairman of Alcoa's Audit Committee from at least March 1998 to at least March 2010, and a member of that committee from at least March 1996 to at least March 2010.   Schacht was also a member of Alcoa's Special Committee formed to investigate the Alba allegations.   Schacht breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.   Due to Alcoa's extensive overseas operations, Schacht knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.   Schacht also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in

reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.  As a member of the Audit Committee, Schacht was charged with reviewing and monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance.  Further, in violation of his Audit Committee duties, Schacht knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.  In his capacity as a director of Alcoa, Schacht was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA.  Schacht knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA.  In sum, Schacht utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.  Schacht is a citizen of New York.

25.  Defendant Joseph T. Gorman ("Gorman") was an Alcoa director from 1991 to May 2011.  Gorman was also a member of Alcoa's Audit Committee from at least February 2002 to at least March 2011.  Gorman breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, Gorman knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.  Gorman also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.  As a member of the Audit Committee, Gorman was charged with reviewing and

monitoring the Company's compliance programs, which necessarily included ensuring that Alcoa had sufficient controls in place to ensure FCPA compliance. Further, in violation of his Audit Committee duties, Gorman knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements. In his capacity as a director of Alcoa, Gorman was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA. Gorman knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA. In sum, Gorman utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith. Gorman is a citizen of Ohio.

26.     Defendant Carlos Ghosn ("Ghosn") was an Alcoa director from 2002 to February 2011. Ghosn breached his fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals. Due to Alcoa's extensive overseas operations, Ghosn knew or was reckless in not knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business. Ghosn also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company. In his capacity as a director of Alcoa, Ghosn was specifically charged with overseeing the Company's risk management practices including ensuring Alcoa's compliance with the FCPA. Ghosn knowingly or recklessly allowed Alcoa to violate the FCPA by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA. In sum,

Ghosn utterly failed to act in the face of a known duty to act causing a breach of his duty of loyalty by failing to discharge his fiduciary obligations in good faith.  Ghosn is a citizen of Japan.

27.     Defendant Dahdaleh was the agent of Alcoa and Alcoa World Alumina and is the owner and chairman of Dadco Group and affiliated companies.  Dahdaleh also owned the following shell companies accused of committing fraud on Alba: Alumet Limited, Kwinalum Trading Pte Limited ("Kwinalum"), Alumet Asia Pte Limited ("Alumet Asia"), United Legal Engineering Consultants Limited, and three separate companies named AA Alumina and Chemicals.  Dahdaleh bribed former senior officials of Alba and the Government of Bahrain to induce Alba to: (i) guarantee that the alumina supply contract was awarded to Alcoa's subsidiary; (ii) overpay for alumina; and (iii) cede an equity stake in Alba to Alcoa.  Dahdaleh is a citizen of Canada and the United Kingdom.

28.     Defendant Rice was Vice President of Marketing of Alcoa World Alumina from at least 2001 to December 2006.  Rice was also Vice President of Mining of Alcoa World Alumina and Chemicals ("AWAC") and Co-Chairman of the U.S.-Bahrain Free Trade Agreement Coalition.  Rice bribed former senior officials of Alba and the Government of Bahrain to induce Alba to: (i) guarantee that the alumina supply contract was awarded to Alcoa's subsidiary; (ii) overpay for alumina; and (iii) cede an equity stake in Alba to Alcoa.  Rice is a citizen of Tennessee.

29.     The defendants identified in ¶¶13-26 are referred to herein as "Director Defendants."  The defendants identified in ¶¶13-17, 19-20, 23-25 are referred to herein as "Audit Committee Defendants."  The defendants identified in ¶¶13-26, 28 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

30.     By reason of their positions as officers, directors, and/or fiduciaries of Alcoa and because of their ability to control the business and corporate affairs of Alcoa, the Individual Defendants owed Alcoa and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Alcoa in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Alcoa and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

31.     Each officer and director of the Company owes to Alcoa and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

32.     In addition to these duties, under the Company's Audit Committee Charter, the Audit Committee Defendants, defendants Fuller, Gorman, Gueron, Kleinfeld, Morris, O'Neal, Owens, Schacht, Thomas, and Zedillo, owed specific duties to Alcoa to review and approve the Company's risk and exposure and steps that the Company is taking to monitor and control such exposure.   Moreover, the Audit Committee was to report on its risk exposure findings and recommendations.

**Control, Access, and Authority**

33.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Alcoa, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

34.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Alcoa, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

35.     To discharge their duties, the officers and directors of Alcoa were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Alcoa were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Alcoa conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(d)     ensure that the Company was operated in a diligent, honest, and prudent manner.

**Breaches of Duties**

36.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Alcoa, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants knew posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised Alcoa's Board.

37.     The Individual Defendants breached their duties of loyalty and good faith by refusing to consider plaintiff's litigation demand and take no action to protect the Company's assets in the form of claims against those that caused significant harm to the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) refuse to consider plaintiff's demand in accordance with their fiduciary duties; and (ii) refuse to protect Alcoa's claims against potentially culpable fiduciaries by waiting an unreasonable time to take action or enter into tolling agreements while these potential claims against fiduciaries became time barred. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise and delay the prosecution of the Individual Defendants' breaches of fiduciary duty and waste of corporate assets.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly violate the law and then delay prosecuting the wrongdoers that harmed the Company.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

43.     Alcoa is the self-proclaimed world leader in the production and management of primary aluminum, fabricated aluminum, and alumina combined, through its active and growing participation in all major aspects of the aluminum industry, including: technology, mining, refining, smelting, fabricating, and recycling.  Aluminum is a commodity that is traded on the London Metal Exchange and priced daily based on market supply and demand.  Aluminum and alumina represent more than three-fourths of Alcoa's revenues, and the price of aluminum influences the operating results of Alcoa. Alcoa's products are used worldwide in aircraft, automobiles, commercial transportation, packaging, building and construction, oil and gas, defense, and industrial applications.

**The FCPA**

44.     The FCPA is a federal law enacted in 1977.  Its two main provisions are regarding: (i) accounting transparency; and (ii) the bribery of foreign officials.  The anti-bribery provision prohibits any person from making the corrupt use of the mail or interstate commerce, in furtherance of an offer or payment of anything of value to a foreign official, foreign political party, or candidate for political office.  Furthermore, no payment may be made for the purpose of influencing any act of that foreign official in violation of the duty of that official, or to secure any improper advantage in order to obtain or retain business.

45.     As an issuer under the United States federal securities laws, Alcoa's business and operations are also subject to the requirements of the FCPA.  The FCPA requires, among other things, covered companies to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

46.    The FCPA also requires covered companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements, and to maintain accountability for assets.

**Alba's Claims of Conspiracy, Fraud, and RICO Violations Against Alcoa**

56.    Alba, one of the world's largest aluminum smelters, is controlled by Bahrain Mumtalakat Holding Co., B.S.C., a holding company for the Government of Bahrain.  Bahrain was well situated geographically between the source of raw materials, particularly alumina from Australia, and the markets for primary aluminum in Asia, Europe, and the Americas.  Alba produces more than 500,000 tons per year.  As a large smelter, Alba would require a significant amount of alumina, which Alcoa allegedly supplied.

57.    Unexpectedly, on February 27, 2008, Alba sued Alcoa, alleging violations of RICO and at least $1 billion in damages.  The Alba Action alleges that through the use of bribes paid to Alba employees and Bahraini government officials, Alcoa caused Alba to pay excessive prices for aluminum and caused Alba to relinquish a large portion of its shares and ownership interest to Alcoa.  Alba additionally alleges that Alcoa deprived Alba of "the honest services" of officials of Alba and caused the government officials to violate their duties to the Government of Bahrain.  Alba's complaint directly resulted in criminal investigations by the DOJ, British Government, and Swiss Government, into the conduct of the Company and certain individuals associated with the Company.  Those investigations have since resulted in criminal charges against key players in the conspiracy, including defendant Dahdaleh.  The Alba Action survived

three separate motions to dismiss by Alcoa, Dahdaleh, and Rice.  In particular, Judge Ambrose found that Alba's RICO, common law fraud, and conspiracy claims would all move forward.

58.     According to Alba's lawsuit, Alcoa's alleged conspiracy and scheme to defraud began around 1990 and continued until the suit was filed.  Beginning in 1990, through a series of overseas shell companies that were controlled and beneficially owned by defendant Dahdaleh and ultimately directed and operated by Alcoa, Alcoa funneled payments as bribes to officials of Alba and the government of Bahrain.  In 1990, Alba and Alcoa, through its subsidiary Alcoa of Australia, entered into an agreement (the "1990 Contract") under which Alba purchased alumina from Alcoa.  Originally for a ten-year term, the contract was extended by three amendments, ultimately expiring in December 2004.  Throughout the existence of the 1990 Contract and extensions thereto, Alcoa, through its subsidiary, paid Dahdaleh millions of dollars in unearned "commissions."  These "commission" payments were described in a series of "Agency Agreements" between Alumet Limited, an entity owned by Dahdaleh, and Alcoa of Australia. The Agency Agreements identify the Dahdaleh-owned Alumet Limited as the "agent" of Alcoa's subsidiary.

59.     Pursuant to the Agency Agreements, defendant Dahdaleh and Alumet Limited received from Alcoa of Australia initially a per ton fee for shipments to Alba and subsequently a percentage of Alcoa's sales to Alba. Between the years 1990 and 2004, Alcoa, through its subsidiary, paid Dahdaleh more than $13.5 million in these unearned and fraudulent "commissions."  The cost of these commissions was passed on to Alba in the form of inflated alumina prices under the supply agreements with Alcoa's subsidiary.

60.     Between 1993 and 2009, Alcoa assigned portions or all of its supply contracts with Alba to defendant Dahdaleh-owned shell companies.  Pursuant to these assignments, Alcoa,

through its subsidiary Alcoa of Australia, sold alumina to the Dahdaleh-owned entities, which then re-sold the same alumina to Alba at higher prices.  These overpayments were fraudulently exacted from Alba and were used by Dahdaleh to pay quid pro quo bribes to the senior officials of Alba and the Government of Bahrain who induced Alba to enter into these economically disadvantageous contracts.

61.     The 1990 Contract had two metrics to determine the price for alumina. Approximately 60% of the price was set by a formula.    The remaining 40% (the "Market Tonnage") of the price was negotiated by the parties.

62.     From 1993 to 1995, Alba alleges that the Market Tonnage was assigned to a company registered in Singapore named Kwinalum.  Kwinalum was controlled by defendant Dahdaleh and that Kwinalum was a wholly owned subsidiary of Alumet Limited which was also control by Dahdaleh.  Alba also alleges that all revenue from Kwinalum was passed to Alumet Limited.  The Market Tonnage is alleged to have been assigned to these Dahdaleh-controlled companies in order to facilitate bribes that caused Alba to pay excessive prices for alumina while the actual alumina was still provided by Alcoa.

**The 1996 Assignment and Extension**

63.     According to Alba, in 1996, the 1990 Contract was amended to provide that Alcoa of Australia would provide the Market Tonnage to Alba from 1997 through 2000 (the "1996 Amendment").  At the time, Belda was then serving as Vice Chairman of the Alcoa Board, which by then also included defendants Gorman, Schacht, Thomas, and Gueron.  The 1996 Amendment was signed by Peter Burgess, Sales and Marketing Manager of Alcoa World Alumina, on behalf of Alcoa of Australia.

64.     Allegedly, Alcoa's executives caused the Market Tonnage portion of the contract to be assigned to Alumet Asia, another defendant Dahdelah-controlled company, in order to facilitate bribes that caused Alba to pay inflated prices due to the alleged bribes.  Alba alleges that Alumet Asia was the new name for Kwinalum, which had provided the Market Tonnage from 1993 through 1995.  Under the 1996 Amendment, Alcoa was still the party providing the alumina.

65.     Alba alleges the 1996 Amendment which assigned the Market Tonnage to Alumet Asia had no legitimate business reason and was controlled and beneficially owned by defendant Dahdaleh.  Furthermore, Alba alleges Alumet Asia existed solely as a front for the sales of alumina to Alba and a vehicle for defrauding Alba.  To further the scheme, Alcoa's subsidiary also continued to pay unlawful commissions to Dahdaleh, some of which were transferred to one or more former senior officials of Alba and the Government of Bahrain.

**The 2001 Extension**

66.     In 2001, Alba and Alcoa of Australia amended the 1990 Contract to extend its term through 2003 (the "2001 Extension").  The 2001 Extension was proposed by Alcoa World Alumina through its officer, defendant Rice, by an April 21, 2001 letter on Alcoa World Alumina stationery sent from Pittsburgh, Pennsylvania.  At this time, Alcoa's Board consisted of defendants Belda, Gorman, Schacht and Gueron.

67.     Alcoa of Australia was the only source of alumina under the 2001 Extension.  Alba alleges that the 2001 Extension was structured to facilitate the payment of bribes in order for Alcoa to charge excessive prices for Alumina.  Alcoa continued to operate through defendant Dahdaleh-controlled companies under the 2001 Extension.  Alba alleges that the 2001 Extension was executed by a Dahdaleh associate, David Dabney ("Dabney"), on behalf of Alcoa of

Australia; however, Dabney was not an employee of Alcoa of Australia.  Dabney was an officer and shareholder of several Dahdaleh-controlled entities.

68.     Alba alleges that at the time of 2001 Extension, Dabney was an employee of defendant Dahdaleh-controlled Dadco and its affiliate Dadco Alumina and Chemicals.  Dabney executed the 2001 Extension at the direction of Dahdaleh.

69.     Dabney transmitted the executed 2001 Extension to Alba by letter.  The letterhead was that of AA Alumina and Chemicals and bore the logo of Alcoa Australia.  However, no Company named AA Alumina and Chemicals was incorporated in Australia or Switzerland on the date of the 2001 Extension letter, and the address on the letter was in fact the address of a defendant Dahdaleh-controlled company, Dadco.  The 2001 Extension provided that Alba would direct communication to Dabney via a confidential fax number that Alba says was Dadco's.  Approximately four months after Dabney executed the 2001 Extension, AA Alumina and Chemicals was incorporated in Switzerland, with Dabney as President and majority shareholder.

70.     Alba alleges that AA Alumina and Chemicals was controlled by defendant Dahdaleh and was the first of three companies incorporated in Switzerland and controlled by Dahdaleh with the same name.  Alba refers to them as AAAC-1, AAAC-2, and AAAC-3 (collectively the "AAAC Companies").

71.     AAAC-1 was incorporated on December 19, 2001.  Its name was then changed twice: to CI Chemicals Industries SA (on March 20, 2002) and then to Dadco Property SA (on March 3, 2004).  All invoices to Alba under the 2001 Extension from January 1, 2002 through approximately March 20, 2002, were issued by AAAC-1, rather than Alcoa of Australia.

72.     AAAC-2 was incorporated on approximately March 15, 2002.  AAAC-2 issued invoices to Alba from approximately March 20, 2002 through the end of 2003.

73.     According to Alba, the invoices from AAAC Companies sought to create the appearance that they were provided on behalf of Alcoa and Alcoa of Australia because they bore the Alcoa logo and identified AA Alumina and Chemicals as "an associate company" of Alcoa of Australia.   For example, Alba alleges that a March 3, 2002 e-mail to defendant Rice in anticipation of a visit by representatives of Alba to an operating facility of Alcoa in Tennessee stated, "Just for proper form, I don't make Victor's activities on behalf of [a recipient of defendants' bribes], knowledgeable to the plant hence I have removed references to him from your email before forwarding it to others."   In an e-mail response on March 4, 2002, Rice stated that the host of the Tennessee visit "is also not aware of Victor's role so we should not get into any misunderstandings."

74.     Alcoa, through its subsidiary, also continued to pay unlawful "commissions" to defendant Dahdaleh during this time period pursuant to their Agency Agreement.   Dahdaleh, in turn, made multiple payments to senior members of Alba and the Government of Bahrain. According to Alba, between 1999 and 2004, Dahdaleh transferred tens of millions of dollars to the officials of Alba and the Government of Bahrain.   In exchange for the bribes, officials induced Alba to pay excessive prices for Alcoa's alumina.

75.     As part of its RICO claim, Alba must prove that the conduct substantially affected interstate commerce.   In order to meet this threshold requirement, and pursuant to:

(a)     instructions on the first four invoices AAAC-1 issued, Alba executed several wire transfers to an account at the Royal Bank of Canada in New York, previously used in invoices by Alumet Asia for further credit to an account of AA Alumina and Chemicals; and

(b)     the instructions on subsequent invoices, Alba executed wire transfers (most exceeding $10 million each) to Deutsche Trust Company America and Bankers Trust

Company in New York, for the benefit of an account of AA Alumina and Chemicals at Royal Bank of Canada.

**The 2003 Extension**

76.     A further extension to the 1990 Contract was proposed by Alcoa in 2003 (the "2003 Extension").  Alba agreed to the 2003 Extension in a letter on September 17, 2003.  The 2003 Extension was to expire at the end of 2004.  During the period of the 2003 Extension, Alcoa allegedly continued to pay bribes to induce Alba to pay excessive prices for alumina to which it would not otherwise have agreed.  Alcoa allegedly sought the extension to maintain the role of defendant Dahdaleh-controlled entities and Dahdaleh associates.

77.     The September 17, 2003 letter was sent by a defendant Dahdaleh associate Sandra Ainsworth ("Ainsworth").  At that time, Ainsworth was the administrative and shipping manager of AAAC-2 and company secretary of Dadco.  She was also the former administrative manager of Alumet Asia.  Moreover, the letter sought to convey the false impression that it was sent on behalf of Alcoa as it bore the Alcoa logo and referred to "our excellent long term relationship for the last thirty years."

78.     AAAC-2 continued to invoice Alba throughout the period of the 2003 Extension. AAAC-2 changed its name to PA Asset Management SA on September 16, 2004, yet continued to invoice Alba as AAAC-2 until the conclusion of the contract.  This deception induced Alba to believe that Alba was dealing with Alcoa subsidiaries under the 2003 Extension.  Alba allegedly made significant payments for alumina in response to the invoices it received.

79.     During the period of the 2003 Extension, Alcoa, through its subsidiary, also continued to pay unlawful "commissions" to defendant Dahdaleh pursuant to the Agency Agreement.  Alcoa and Alcoa World Alumina directed Alcoa's subsidiary to pay the unlawful

commissions with the knowledge and intent that such payments would be transferred on as bribes.  In exchange for the bribes, officials induced Alba to pay excessive prices for alumina.

**The 2005 Extension**

80.      Thereafter, in 2005, Alba entered into an agreement (the "2005 Contract") with yet a third entity known as AA Alumina & Chemicals SA ("AAAC-3" or "AAAC Limited") under which Alba currently purchases alumina.  The Alcoa Board then consisted of defendants Belda (Chairman), Gorman, Schacht, Gueron, Fuller, Zedillo, Ghosn, and Owens.

81.      AAAC-3 is allegedly controlled by defendant Dahdaleh.  AAAC-3 was incorporated on December 30, 2004, after AAAC-2 was renamed PA Asset Management SA. AAAC-3 is registered at the same address as the former headquarters of Alcoa Europe.  Alba alleges that the 2005 Contract was entered on unfavorable terms in order for Alcoa to acquire a controlling stake in Alba at a depressed price through bribery and extortion.

**Equity Stake in Alba Through Alleged Bribery**

82.      On September 15, 2003, the Government of Bahrain and Alcoa signed a memorandum of understanding ("MOU") for the Government's sale of up to 26% of Bahrain's shares in Alba to Alcoa or "a controlled-affiliate of Alcoa," in exchange for one million tons of alumina per year in perpetuity at cost plus management fees.  The Alcoa Board then consisted of defendants Belda (Chairman), Gorman, Schacht, Gueron, Fuller, Zedillo, and Ghosn, a majority of the current Board.  It was allegedly anticipated that Alba would then sell aluminum to Alcoa at the market price.  Defendants Rice and Dahdaleh, among others, represented Alcoa throughout the negotiations.  Rice and Dahdaleh allegedly were in contact with officers of Alba and the Government of Bahrain who were recipients of Alcoa's bribes during the course of the negotiations.

83.     Alba alleges that in negotiating the MOU, an officer of Alba who was a recipient of Alcoa's bribes objected to including a term that would benefit Alba by providing that Alba could withdraw from the transaction.  The Government of Bahrain allegedly withdrew from the transaction after concluding that it was not in the best interests of Alba or the government for two reasons.   First, the terms of the transaction allegedly dramatically undervalued the Government of Bahrain's shares in Alba.  Alcoa valued the shares at $600 million, while the true value was allegedly really closer to $1 billion.   Second, the transaction would allegedly give Alcoa a substantial equity interest and voting rights in Alba but, in exchange, Alcoa only offered what was termed a "virtual contract" – i.e., an intangible promise from Alcoa to supply alumina in perpetuity.   Despite the inequity of Alcoa's offer, an official of Alba who was allegedly a recipient of bribe payments by Alcoa pressured a Bahrainian government official to consummate the transaction.

84.     Defendant Rice also attempted to exert influence on Alba and Bahraini government employees to consummate the transaction.  Rice, who was Co-Chairman of the U.S.-Bahrain Free Trade Agreement Coalition, pressured a Bahrainian government official, suggesting that if the proposed transaction was not approved, he might not be able to support the adoption of the free trade agreement.  Eventually, the MOU was terminated and no agreement was reached between the parties.

**The 2005 Contract**

85.     Upon termination of the MOU, Alba allegedly had only approximately three months to secure its alumina supply before the termination of the 1990 Contract on December 31, 2004.  Alba published a tender for alumina requirements during years 2005-2014. In order to secure a new contract, defendant Dahdaleh allegedly transferred approximately

$100,000 to Alba's CEO to secure this contract. Alba alleges that these payments were bribes and had no legitimate commercial purpose.  Their purpose was to cause the bribed officials to induce Alba to award the alumina supply agreement to Alcoa on terms economically disadvantageous to Alba.

86.     On or about September 29, 2004, defendant Dahdaleh associate David Debney ("Debney") allegedly submitted a bid on behalf of "AA Alumina and Chemicals."  As the negotiation of the 2005 Contract moved forward, officers of Alba, officials of the Government of Bahrain, and another substantial Alba shareholder recommended that Alba reject the proposal offered by "AA Alumina and Chemicals" as not being in the best interests of Alba.  Defendant Rice, purportedly speaking for Alcoa, rejected efforts to further negotiate, and instead threatened to redirect Alcoa's alumina supply to other customers.

87.     Alba alleges that in order to secure the bid submitted by Debney, defendant Dahdaleh transferred another bribe to Alba's CEO.  Alba alleges these bribes were provided in order to ensure that Alcoa, through its agents and subsidiaries, would be awarded the contract.

88.     Rather than further negotiate, Alba was threatened with Alcoa taking their alumina supply to other customers.  However, an official of Alba allegedly directed that the company agree to Alcoa's offer after receiving bribes from Alcoa and did so because he stood to gain personally.

89.     Alba signed the 2005 Contract on June 8, 2005, with AAAC-3.  The Alcoa Board then consisted of defendants Belda (Chairman), Gorman, Schacht, Gueron, Fuller, Zedillo, Ghosn, and Owens, almost all of the current Alcoa Board.  The term of the contract runs from January 1, 2005 to December 31, 2014.  According to Alba, the price set by the 2005 Contract is excessive and Alba would not have agreed to it but for defendants' unlawful acts.  According to

Alba, the "price that Defendants secured through their acts of bribery and extortion was excessive." By its own estimates, Alba paid about 2% over the market rate for alumina. This allegedly represents an overpayment of approximately 10% over the life of the contract. Alcoa's allegedly unlawful overcharges to Alba amount to approximately $25-45 million per year.

90.     In sum by its action, Alba seeks to show that over a fifteen-year period, Alcoa violated the anti-bribery laws and money-laundering prohibitions. The Alba Action has already withstood three motions to dismiss, exposing the Company to billions of dollars in fines and penalties, and over a billion dollars in potential civil liability. The DOJ has intervened in Alba's civil suit to facilitate its own criminal investigation. Even if Alba's civil suit is not successful, criminal charges are never made or proven, and Alcoa is not forced to disgorge profits tainted by illegality, the Company will expend millions of dollars investigating and disproving the charges and will suffer immense reputational harm.

**The Arrest of Defendant Dahdaleh and Bruce Hall**

91.     The lengthy government investigations are beginning to result in arrests, yet Alcoa has held no one responsible and refused to investigate plaintiff's demand. On October 24, 2011, the Serious Fraud Office of the United Kingdom unsealed criminal charges against defendant Dahdaleh and caused Dahdaleh to be arrested. Dahdaleh was charged with corruption offenses under U.K. law, involving payments of bribes to officials of Alba. In announcing these charges, the Serious Fraud Office stated that the alleged corrupt payments "were in connection with contracts with a U.S. company, Alcoa Inc., for supplies of alumina...."

92.     On October 20, 2011, Bruce Hall ("Hall"), a former CEO of Alba, was arrested in Sydney, Australia, in response to an extradition request issued by the Government of the United

Kingdom.  Hall faces charges similar to those instituted against Dahdaleh by the Serious Fraud

Office.

**If Alba's Allegations Are True, Alcoa's Self-Proclaimed Internal Controls Based on Values and Integrity Utterly Failed**

93.    On July 30, 2002, defendant Belda, Alcoa's Chairman of the Board and CEO

released a letter on corporate governance at Alcoa entitled "Alain Belda's Letter to Alcoans on

The Importance of Integrity at Alcoa."  The letter stated:

> July 30, 2002
>
> Confidence and trust in business haven't been so sternly tested in the U.S. for as long as I have been working. Scandals at Enron, Global Crossing, Tyco, WorldCom, Qwest, Adelphia, etc. have eroded the public confidence not only in business as an institution, but in regulators, auditors and the American capital market system in general.
>
> Here, in this developed economy, people from all over the world have been willing to invest in "pieces of paper" because of a basic trust that there are systems in place to make the "pieces of paper" valuable. What is happening is that the trust about investing in "pieces of paper" is being eroded by the idea that there is not an oversight system that works to protect the investor. It is also being eroded by the actions and omissions of some of the people entrusted to run these companies, and oversee their governance and reporting.
>
> When confidence is not present, investors want hard assets, not "pieces of paper." This freezes capital and slows growth and opportunities. Far more is at stake than the accounting and governance of companies. At risk is the trust of investors, employees, the public and the ethical viability of the corporate sector and capitalism.
>
> For all these reasons, I support the recommendations from the different branches of government and others that are requiring more transparency, more disclosure, better and stronger control of the accounting industry, and better governance.
>
> In the next few days, Rick Kelson, our CFO, and I will be signing documents attesting that our financial statements represent the truth as we know it, and include all material information necessary to ensure that such financial statements are not misleading. I have always believed that the CEO is responsible for the acts of the company and agree that I should be accountable for the financial disclosures of Alcoa.

While we have not completed the process, I will take the risk to say that I do this with a strong belief that our governance processes, our controls and transparency have been implemented well ahead of these recent requirements and mandates. This stems from our Values structure - the overall company culture of integrity and accountability to do the right thing, rather than the expedient one.

There is no amount of laws or regulations that will force a company to behave with integrity. Learning from these events, we are taking steps to further improve standards, controls and accountabilities. The best line of defense is for integrity to be a part of the living Values of each individual member, each Alcoan.

Finally, we should look at these events as an opportunity to renew the pride we have in Alcoa and Alcoans, of our Values and of the way we live them. It should enhance your confidence in the company, your colleagues and our future.

94.     Alba's allegations state the bribery scandal had been ongoing for over eight years at the time this letter was made public.  If Alba is correct, defendant Belda's misleading statements about Alcoa's stern corporate governance measures were used to cover up the lack of internal controls at the Company.

95.     The defendants paid lip service to the Company's oversight of their employees, strong values, and integrity.  However, according to Alba, Alcoa or its agents were paying bribes to foreign officials and employees of a foreign, state owned company.  Defendants claimed to have corporate governance that was based on the value of integrity.   For example, Alcoa's "Corporate Governance Guidelines" stated:

> ***Alcoa is a values-based company***. Our Values guide our behavior at every level and apply across the company on a global basis. We expect all directors, officers and other Alcoans to conduct business in compliance with our Business Conduct Policies, and we survey compliance with these policies on an annual basis. Alcoa endorses The Business Roundtable Principles of Corporate Governance dated May 2002, which is a comprehensive statement of responsible corporate governance principles. These principles provide the foundation on which our Corporate Governance Guidelines and our board committee charters are based. All of the highlighted documents are publicly available on our web site.

> **Director responsibilities**

> The core responsibility of the directors is to exercise their business judgment and act in what they reasonably believe to be the best interests of the company.

Serving on a board requires significant time and attention on the part of directors. Directors should participate in board meetings, review relevant materials, serve on board committees and prepare for meetings and discussions with management. Directors are encouraged to attend the annual meeting of shareholders.

Directors are expected to notify the Chairman and CEO and the Corporate Secretary before accepting a seat on the board of another business corporation as well as any non-profit or charitable organization, in order to avoid potential conflicts.

Directors are expected to maintain an attitude of constructive involvement and oversight; they are expected to ask incisive, probing questions and require accurate, honest answers; they are expected to act with integrity; and they are expected to demonstrate a commitment to the company, its values and its business plan and to long-term shareholder value.

In performing their oversight responsibilities, directors rely on the competence and integrity of management in carrying out their responsibilities. It is the responsibility of management to operate the Company in an effective and ethical manner in order to produce value for shareholders.

96.     Alcoa's Board had access to the Company's management and were encouraged to seek information from all Company operations.   The Company's Corporate Governance Guidelines describe the Board's access to management.   The Corporate Governance Guidelines stated:

**Director access to management and, as necessary and appropriate, independent advisors**

The board must have accurate, complete information to do its job; the quality of information received by the board directly affects its ability to perform its oversight function effectively. Directors should be provided with, and review, information from a variety of sources, including management, board committees, outside experts, auditor presentations and other reports. The board should be provided with information before board and committee meetings with sufficient time to review and reflect on key issues and to request supplemental information as necessary.

Effective corporate directors are diligent monitors, but not managers, of business operations. Directors should have access to management, as needed, to fulfill their oversight responsibilities. Any meetings outside of regularly scheduled meetings that a director wishes to initiate with management should be coordinated through the Chairman and CEO or the Corporate Secretary.

97.     In Alcoa's 2011 Proxy Statement filed with the SEC on March 12, 2012, the Company stated:

> Alcoa is a values-based company. Our values guide our behavior at every level and apply across the company on a global basis. We expect all directors, officers and employees to conduct business in compliance with our Business Conduct Policies and we survey compliance with these policies on an annual basis. The board has adopted a number of policies to support our values and good corporate governance, including Corporate Governance Guidelines, board committee charters, Director Independence Standards, a Code of Ethics for the CEO, CFO and other financial professionals and Related Person Transaction Approval Policy.

98.     The same language was in the Company's 2008-2011 Proxy Statements and the Company has similar language as far back as its 2004 Proxy Statement filed with the SEC on February 22, 2005.   Also appearing in Alcoa's Proxy Statements were references to the Company's "Business Conduct Policies and Code of Ethics."  In the Company's Proxy Statement filed with the SEC on March 12, 2012, the Company stated:

**BUSINESS CONDUCT POLICIES AND CODE OF ETHICS**

The company's Business Conduct Policies, which have been in place for many years, apply equally to the directors and to all company officers and employees, as well as those of controlled subsidiaries, affiliates and joint ventures. The directors and employees in positions to make discretionary decisions are surveyed annually regarding their compliance with the policies.

In November 2003, the board adopted a code of ethics applicable to the CEO, CFO and other financial professionals, including the principal accounting officer and those subject to it are surveyed annually for compliance with it. Only the Audit Committee can amend or grant waivers from the provisions of this code, and any such amendments or waivers will be posted promptly at http://www.alcoa.com. To date, no such amendments have been made or waivers granted.

99.     Alcoa and its Board took vast steps to assure the shareholders of its compliance with the applicable laws and regulations.  The Board included statements about their oversight of the Company in SEC filings, on the Company's website and in its corporate governance

documents.  Alcoa even claims to have an Ethics and Compliance Program to ensure that all laws are followed.  The Ethics and Compliance section of Alcoa's website[1] states:

### Ethics and Compliance Program

Alcoa's Ethics and Compliance Program is intended to ensure that all Alcoa employees understand and fully comply with the letter and spirit of the laws and regulations that govern our businesses, as well as our business conduct policies and guidelines.

The program is designed, implemented, and enforced so that it will be effective in preventing and detecting conduct not conducive to our values.

100.    Alcoa's "Business Conduct Policies" apply "equally to the Board of Directors, officers and employees at all levels of Alcoa Inc. and each subsidiary, partnership, joint venture or other business association that is effectively controlled by Alcoa directly or indirectly."  The Business Conduct Policy stated:

1.      The company and its directors, officers and employees shall comply with all laws and regulations that are applicable to the company's activities.

2.      All directors, officers and employees shall comply with the company's policy on Insider Trading.

3.      No receipt or payment of funds, property, service or thing of value shall be made by the company with the intent or understanding that any part thereof is to be used for any unlawful purpose or for any purpose other than as described in the documentation which evidences or supports the transaction.

4.      Compliance with accepted accounting rules and controls is required at all times. All reports and documents filed with the Securities and Exchange Commission or any other governmental agency, as well as all other public disclosures, shall contain full, fair, accurate and timely disclosures.

5.      No false, artificial or misleading entries in the books and records of the company shall be made for any reason whatsoever. No fund or asset that is not fully and properly recorded and no accounting entries or books of account that do not truly reflect the transactions to which they relate shall be created or permitted to exist.

---

[1] *See* http://www.alcoa.com/global/en/about_alcoa/corp_gov/sustainability_metrics.asp.

6.      Gifts, favors and entertainment may be given at company expense or accepted by directors, officers or employees from a competitor or an individual or firm doing or seeking to do business with the company only if they meet all of the following criteria:

(a)     they are consistent with customary business practices and do not violate applicable law or ethical standards;

(b)     they are not excessive in value;

(c)     they cannot be construed as a bribe, payoff or improper inducement; and

(d)     public disclosure of the facts would not embarrass the company or the director, officer or employee.

Payments or gifts of cash (or of cash equivalents such as stocks or commodities) to or from a competitor or an individual or firm doing or seeking to do business with the company are never permitted and may not be solicited, offered, made or accepted by directors, officers or employees.

* * *

12.     Any director, officer or employee who discovers an event of a questionable, fraudulent or illegal nature which is, or may be, in violation of the foregoing policies is to immediately report such event to the General Counsel of Alcoa. Retribution against any officer or employee for such reporting is prohibited and will not be tolerated.

13.     Violation of the foregoing policies by any officer or employee will result in appropriate, case specific discipline that may include demotion or discharge. The company shall not delegate substantial discretionary authority to any individual who, in the good faith judgment of the company, has shown a propensity to engage in illegal activities.

101.    However, according to Alba, a lengthy and extensive bribery scheme occurred during this very time that Alcoa was emphasizing its corporate governance.  If Alba is correct, Alcoa's representatives were not monitoring, formulating, or implementing sufficient internal controls to deal with the Company's payment of bribes to Alba employees and foreign officials. The statements regarding Alcoa's corporate governance policies would then be false and misleading to the shareholders and encouraged an atmosphere of speaking of ethics, but not abiding by them.  Because of the substantial liability the Board members would face for these

improper statements and other harm caused to the Company, the Board had a vested interest in not finding out the truth and impaneling truly independent and disinterested persons to conduct an adequate review of plaintiff's litigation demand.

## DAMAGES TO ALCOA CAUSED BY THE INDIVIDUAL DEFENDANTS

102.    According to Alba, Alcoa paid tens of millions of dollars' worth of illegal bribes to senior Alba employees and Bahrain government officials.  As a direct and proximate result, Alcoa has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)    costs of potentially billions of dollars needed to settle the investigations or lawsuits or to satisfy an adverse judgment;

(c)    costs incurred or to be incurred from potential fines paid in connection with government investigations;

(d)    costs incurred related to potential criminal charges being filed against the Company;

(e)    losses to the Company's business due to loss of business with Alba as a result of its past actions; and

(f)    costs incurred from compensation, benefits, and severance paid to the defendants who have breached their duties to Alcoa.

103.    Moreover, if Alba's allegations are true, those involved in the bribery scheme have irreparably damaged Alcoa's corporate image and goodwill.

104.    Rather than seeking to preserve the claims against the culpable fiduciaries for the above harm, the Board has chosen to ignore plaintiff's demand while a separate committee engages in an investigation that appears to have no limits on the length of time.  Thus, the Board is complacent in letting Alcoa's claims that for the harm its fiduciaries caused go unclaimed, rather than proactively protect these corporate assets.

## DERIVATIVE ALLEGATIONS

105.    Plaintiff brings this action derivatively in the right and for the benefit of Alcoa to redress injuries suffered, and to be suffered, by Alcoa as a direct result of the breaches of fiduciary duty, waste of corporate assets, and contribution and indemnification as well as the aiding and abetting thereof, by the Individual Defendants.  Alcoa is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106.    Plaintiff will adequately and fairly represent the interests of Alcoa in enforcing and prosecuting its rights.

107.    Plaintiff was a shareholder of Alcoa at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Alcoa shareholder.

108.    The Board of Alcoa consists of the following eleven individuals:  defendants Kleinfeld, Gueron, Fuller, Zedillo, Owens, Tata, Morris, O'Neal, and Russo and non-defendants Arthur D. Collins, Jr. and Martin Sorrell.

109.    On March 21, 2008, pursuant to Pennsylvania law, plaintiff sent a letter to the Board demanding that it conduct an investigation by truly independent persons to determine the nature and extent of the illegal bribery scheme alleged by Alba and take legal action on behalf of Alcoa against each Alcoa Board member, senior officers, and any agents that breached their

fiduciary duty in allowing or causing the scheme alleged in the Alba Action (the "Demand").  In particular, plaintiff asserted that the Board must make the following determinations in the investigation:

        (a)      determine which Alcoa employees, officers, and/or directors, current or former, were responsible for the illegal bribery scheme;

        (b)      determine who stood to benefit from the illegal bribery scheme;

        (c)      determine which Alcoa employees, officers, and/or directors, current or former, knew, or were reckless in not knowing, about the illegal bribery scheme, but failed to stop or prevent it;

        (d)      determine which Alcoa employees, officers, and/or directors, current or former, were responsible for overseeing the Company's internal controls in regard to its dealing with foreign governments, corporations, and persons;

        (e)      determine how the illegal bribes were accounted for in Alcoa's books and whether any of the financial statements issued by the Company were false or misleading due to the accounting of illegal bribes; and

        (f)      determine the extent Alcoa was damaged by all the foregoing.

110.     In addition, the Demand also included a demand for certain books and records related to the allegations in the Alba Action.  A true and correct copy of plaintiff's Demand is attached to this Complaint as Exhibit A.

111.     On March 31, 2008, Julie A. North, Esq. ("Ms. North"), of Cravath, Swaine & Moore LLP, wrote plaintiff's counsel to confirm receipt of plaintiff's Demand.  Ms. North assured plaintiff's counsel that the Board would consider plaintiff's Demand at its next regularly scheduled meeting.  Ms. North also denied plaintiff's demand to inspect books and records

because of the stay in discovery in the Alba Action.  A true and correct copy of Ms. North's March 31, 2008 letter is attached hereto as Exhibit B.

112.    On April 17, 2008, plaintiff's counsel wrote to Ms. North disagreeing with her position regarding the stay in discovery in the Alba Action.  The stay in the Alba Action merely halted active litigation in that matter only.  Moreover, the inspection demand is not discovery, it is a fundamental property right of a shareholders, so the stay in the Alba Action was not applicable here.  A true and correct copy of plaintiff's April 17, 2008 letter is attached hereto as Exhibit C.

113.    On April 28, 2008, Ms. North again wrote to inform plaintiff that Alcoa would not honor her common law and statutory rights to inspect the Company's books and records. A true and correct copy of Ms. North's April 28, 2008 letter is attached hereto as Exhibit D.

114.    On May 19, 2008, Ms. North wrote plaintiff's counsel and informed them that a purported Special Committee, comprised of defendants Thomas and Shacht, had been formed to investigate the Alba allegations.  Thomas and Shacht had purportedly hired Baker & McKenzie to investigate the Alba allegations.  The letter did not contain any indication that this Special Committee had investigated or retained counsel to investigate plaintiff's Demand.  Ms. North further wrote that the Board determined that it was not in Alcoa's best interest, at this time, to conduct another investigation pursuant to plaintiff's Demand.  Ms. North did convey that the Board would reassess this decision when the DOJ and the internal investigation had been completed.  A true and correct copy of Ms. North's May 19, 2008 letter is attached hereto as Exhibit E.

115.    In a letter dated June 27, 2008, plaintiff explained that delay in litigation would compromise Alcoa's interests.  In addition, plaintiff explained that delay may facilitate the

destruction of relevant documents, loss of evidence, or other obstruction of truth.  Accordingly, plaintiff reiterated her demand that the Board initiate litigation without delay against the wrongdoers.  Plaintiff's counsel also explained how the Company's position regarding the shareholder inspection demand was unfounded and improper under applicable law and would not impinge upon the integrity of the government's investigation.  A true and correct copy of plaintiff's June 27, 2008 letter is attached hereto as Exhibit F.

116.    On July 15, 2008, plaintiff received a letter from Robert B. Sommer, Esq. ("Mr. Sommer") of Hergenroeder Rega and Sommer, L.L.C., who was purportedly retained to represent the Company in a shareholder derivative action.  Mr. Sommer reiterated the position that Ms. North had already established, namely, that the Company would not consider plaintiff's litigation demand and that the inspection demand was a discovery tactic (despite the fact there was no pending litigation) that was not permitted under the stay of discovery in the Alba Action. Mr. Sommer also claimed that the DOJ would seek to intervene to prevent any disclosure of documents if plaintiff instituted any legal proceedings seeking access to the documents she requested to inspect.  A true and correct copy of Mr. Sommer's July 15, 2008 letter is attached hereto as Exhibit G.

117.    On September 25, 2008, plaintiff's counsel again wrote to Mr. Sommer to convey plaintiff's concern that the Special Committee and Company were compromising Alcoa's future claims against potential wrongdoers by not investigating plaintiff's Demand and waiting for the DOJ investigation to be completed.  A true and correct copy of plaintiff's September 25, 2008 letter is attached hereto as Exhibit H.

118.    On October 15, 2008, Mr. Sommer responded to plaintiff's letter and once again stated that the Special Committee continued to decline to review plaintiff's Demand.  A true and correct copy of Mr. Sommer's October 15, 2008 letter is attached hereto as Exhibit I.

119.    In subsequent letters, the Board stated that it would not begin an investigation pursuant to plaintiff's letter because it believed it overlapped with what the Special Committee was already considering.  The Board also stated that it would further consider plaintiff's Demand once the investigation being conducted by the Special Committee and the DOJ were complete.

120.    Additionally, plaintiff has demanded to inspect certain of the Company's books and records, including meeting minutes of the Board and the Special Committee.  Alcoa has refused these demands, stating that giving plaintiff access to this information would be inconsistent with the DOJ staying the Alba Action.  Thus, plaintiff has been unable to confirm even the most rudimentary facts about the Special Committee's investigation, let alone if it really does cover her Demand as the Board claims.

121.    On October 24, 2011, the United Kingdom's Serious Fraud Office arrested and charged defendant Dahdaleh with corruption and transferring criminal property.  In response, Alcoa requested U.S. District Judge Donetta Ambrose reopen and lift the stay in the Alba Action.  On November 15, 2011, plaintiff's counsel requested the Board cease delaying its investigation, act in accordance with its fiduciary duties, and hold those that harmed the Company accountable.  A true and correct copy of plaintiff's November 15, 2011 letter is attached hereto as Exhibit J.

122.    On January 12, 2012, Ms. North informed plaintiff's counsel that the Board declined to investigate plaintiff's Demand.  A true and correct copy of Ms. North's January 12, 2012 letter is attached hereto as Exhibit K.

123.    The Board's refusal to give plaintiff a dispositive response to her Demand is improper.  As alleged herein, Alcoa has been exposed to potentially billions of dollars in liability in connection with the alleged actions of defendants and others to pay bribes to Bahrain government officials and senior employees of Alba.  As repeatedly demanded by plaintiff, the Board must act to preserve the Company's interests.

124.    Due to the foregoing, plaintiff believes the institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

125.    Plaintiff has not made any demand on the shareholders of Alcoa to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Alcoa  is a publicly held company with over one billion shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Individual Defendants for Breach of Fiduciary Duty

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    The Individual Defendants owed and owe Alcoa certain fiduciary duties.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Alcoa the highest obligation of good faith, fair dealing, loyalty, and due care.

128.    The Individual Defendants, and each of them, violated and breached their fiduciary duty of loyalty.

129.    Plaintiff specifically brought to the Board's attention that it was letting claims potentially worth billions of dollars expire by not bringing litigation or entering into tolling agreements with the potential culpable fiduciaries that engaged in the bribery scheme alleged by Alba.  Nevertheless, the Board consciously refused to act on plaintiff's Demand, instead relying on investigations that had no sign of completion, even though all claims would likely be barred by applicable statutes of limitations.

130.    Director Defendants Kleinfeld, Gueron, Fuller, Zedillo, Owens, Tata, Morris, O'Neal, and Russo's refusal of Plaintiff's Demand was in bad faith and in breach of their duty of loyalty.  Plaintiff's Demand specified the wrongdoing which had occurred at Alcoa and identified those responsible.  In response, Director Defendants Kleinfeld, Gueron, Fuller, Zedillo, Owens, Tata, Morris, O'Neal, and Russo did nothing.  They unreasonably delayed in responding to plaintiff's Demand for over three years.  They also failed to conduct a reasonable investigation into the allegations of plaintiff's Demand; indeed, they did not conduct any investigation, but relied on a Special Committee that was not formed in response to plaintiff's Demand.  Director Defendants Kleinfeld, Gueron, Fuller, Zedillo, Owens, Tata, Morris, O'Neal, and Russo admitted that their refusal of plaintiff's Demand was not based on a conclusion regarding the merits of the allegations in plaintiff's Demand.

131.    Defendants Kleinfeld, Gueron, Fuller, Zedillo, Owens, Tata, Morris, O'Neal, Russo, Belda, Thomas, Schacht, Gorman, Ghosn, and Rice breached their fiduciary duties owed to Alcoa by causing or allowing the illegal bribes of foreign officials and other individuals.  Due to Alcoa's extensive overseas operations, the Individual Defendants knew or was reckless in not

knowing, at all relevant times, that Alcoa was subject to the FCPA, which bars publicly traded companies from bribing officials to obtain or retain business.  The Individual Defendants also knew that, under the FCPA's Books and Records Provision, Alcoa had to implement an internal control system to prevent bribes and kickbacks from occurring at its operations, and to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.

132.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

133.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

134.    Plaintiff, on behalf of Alcoa, has no adequate remedy at law.

## COUNT II

### Against Individual Defendants for Waste of Corporate Assets

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    As a result of the misconduct described above, the defendants wasted corporate assets by: (i) paying hundreds of millions of dollars in improper bribes to Alba employees and members of the Government of Bahrain; (ii) failing to properly consider the interests of the Company and its public shareholders; (iii) failing to conduct proper supervision; and (iv) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

137.    As a result of the waste of corporate assets, the defendants are liable to the Company.

138.     Plaintiff, on behalf of Alcoa, has no adequate remedy at law.

## COUNT III

### Against Individual Defendants for Contribution and Indemnification

139.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.     The Company is alleged to be liable for violations of the FCPA and RICO by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

141.     The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the defendants' misconduct.

## COUNT IV

### Against Defendant Dahdaleh for Aiding and Abetting Breaches of Fiduciary Duty

142.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.     Defendant Dahdaleh aided and abetted defendants Kleinfeld, Gueron, Fuller, Zedillo, Owens, Tata, Morris, O'Neal, Russo, Belda, Thomas, Schacht, Gorman, Ghosn, and Rice in breaching their fiduciary duties owed to the Company.

144.     Defendants Kleinfeld, Gueron, Fuller, Zedillo, Owens, Tata, Morris, O'Neal, Russo, Belda, Thomas, Schacht, Gorman, Ghosn, and Rice owe and owed to Alcoa certain fiduciary duties as fully set out herein.

145.     By committing the acts alleged herein, defendants Kleinfeld, Gueron, Fuller, Zedillo, Owens, Tata, Morris, O'Neal, Russo, Belda, Thomas, Schacht, Gorman, Ghosn, and Rice breached their fiduciary duties owed to Alcoa.

146.     Defendant Dahdaleh participated in the breaches of the fiduciary duties by the Individual Defendants for the purpose of advancing his own interests.  Dahdaleh obtained and will obtain pecuniary benefits from the transfer of Alcoa funds in violation of the FCPA and RICO and colluding in or aiding and abetting the Individual Defendants' breaches.

147.     Plaintiffs, on behalf of Alcoa, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Alcoa to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Alcoa and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Alcoa to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the accuracy of the qualifications of Alcoa's directors, executives, and other employees;

4.      a proposal to strengthen the Company's monitoring of its foreign operations and compliance with the FCPA;

5.      a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal controls, and auditing matters; and

6.      appropriately test and then strengthen the internal audit and control functions.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding or imposing a constructive trust on defendants' assets so as to assure that plaintiff, on behalf of Alcoa, has an effective remedy;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 19, 2012                 STEPHEN J. O'BRIEN & ASSOCIATES

S/STEPHEN J. O'BRIEN
_____
                  STEPHEN J. O'BRIEN

650 Ridge Road, Suite 400
Pittsburgh, PA 15205
Telephone: (412) 788-7560
Facsimile: (412) 788-7563
E-Mail: sjoatty@hotmail.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
E-Mail: brobbins@robbinsumeda.com
           farroyo@robbinsumeda.com

Attorneys for Plaintiff

436672

VERIFICATION

I, CATHERINE RUBERY, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Contribution and Indemnification, and Aiding and Abetting Breaches of Fiduciary Duty.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _6·15·12_____

_____
CATHERINE RUBERY